UNITED STATES of America,

v.

STATES MARINE LINES, INC., et al.,
Defendants.

No. 71 Cr. 212.

United States District Court,
S. D. New York.

Nov. 8, 1971.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, New York City, for the United States; John J. Tigue, Jr., Asst. U. S. Atty., of counsel.

Samuel Segal, New York City, for defendants States Marine Lines, Inc. and T. Carr Hartley & Sons, Ltd.

Kirlin, Campbell & Keating, New York City, for defendant States Marine-Isthmian Agency, Inc.; Richard E. Repetto, Ralph C. Kreimer, New York City, of counsel.

Wilson & Hopkins, New York City, for defendant Reardon Smith Lines, Ltd.; William A. Wilson, Walter L. Hopkins, New York City, of counsel.

EDWARD WEINFELD, District Judge.

This prosecution arises out of an ill-fated shipment of eighty wild animals, giraffes, zebras, dik diks, gazelles and other types whose native habitat is East Africa. The shipment was made aboard the MS New Westminster City from Mombasa on the east coast of Africa, to the Port of New York, within this district.

The vessel set sail from Mombasa on October 12, 1969, and reached her destination at the Port of New York on November 13, 1969. During the course of the voyage around the Cape of Good Hope, across the South Atlantic and up the east coast of the United States, past Cape Hatteras, eight animals—five zebras, two dik diks, and one giraffe died and were disposed of at sea. Upon arrival here, an additional four zebras were found dead in their crates. These four, together with the remainder of the shipment, were removed from the vessel and transferred to the United States Animal Quarantine Station at Clifton, New Jersey, where fourteen more died, either during processing or soon thereafter.

More than a year later, in February 1971, the indictment was returned against various defendants, charging them with having unlawfully, willfully and knowingly caused and permitted the shipment of the eighty wild animals to be transported to the United States under inhumane and unhealthful conditions, in violation of 18 U.S.C. section 42, and the regulations promulgated thereunder by the Secretary of the Treasury, to wit, 19 C.F.R., section 12.26(j) and (k).

The defendants on trial include the alleged owner, the charterer and the chartering agent of the MS New Westminster City, and the shipper of some of the animals. Also indicted were the master of the vessel and another shipper, but the indictment was severed as to them, since they were beyond the court's jurisdiction.

Specifically, the indictment charges unhealthful conditions in that the animals were shipped on the top deck of the vessel and subjected to heavy rain, cold and other inclement weather; the crates in which the animals were caged were unheated, too small, unsafe, improperly constructed, and otherwise unsuitable for their transportation, thereby causing them injury or death, and that feed given the animals was partially inedible.

The only eyewitness evidence offered by the government as to conditions and treatment of the animals aboard the New Westminster City was the testimony of James Cassidy, who was the junior engineer during the voyage, who then was 22 years of age and had been to sea only once before, and then for about nine or ten months.

Cassidy testified that the animals, caged in rough wooden crates or boxes, were loaded on the top deck of the vessel aft of the midship accommodations facing inwards. The crates were of varying sizes, depending upon the type animal, and were tightly lashed. They were so constructed that spaces of about an inch and a half between the slats permitted ventilation.

Cassidy's duties kept him in the engine room during his watch, from 8 a. m. to noon, and from 8 p. m. to midnight, and thus his observation of conditions and activities was limited, and further so since he went to the top deck where the animals were stowed on his off hours, and then only several times a week. Cassidy testified that two keepers or trainers, one an elderly man, who testified at this trial, and the other a lad of 17, were in attendance upon the animals. As part of his duties, Cassidy pumped water up every morning for the animals, and in the afternoon, whenever he was on the deck, he saw the animals fed.

As to weather conditions, he testified that after leaving Mombasa, it was sunny and warm, about 80 degrees, and continued so for the better part of the first week, when about the fifth day out a storm came up with heavy rain, with the ship pitching and rolling; that the animals were trying to keep their balance and were thrown around a bit.

He further testified that the crates which were lashed to the deck did not wobble from one side to the other; that tarpaulins placed over the crates sheltered the animals from the wind, rain and other elements; that the tarpaulins covered the tops of the crates; that those used for the giraffes had an opening that permitted them to move their necks above the top; and that the crates for the gazelles had wire mesh.

The storm subsided after a few days, and during the second and third weeks the weather was in the 80's, with the sea quiet and calm. Beginning with the fourth week, the weather gradually got colder; the sea roughened and the wind picked up, and upon arrival in New York on November 13, it was cold.

The first animal died about two days after the storm—that is, about eight days after the vessel left Mombasa, and thereafter other zebras, dik diks and a giraffe met a similar fate—in all, eight died during the voyage and were disposed of at sea. Pictures taken by Cassidy of some of the animals as they were being thrown overboard showed their bodies marked by abrasions and cut knees, and Cassidy so testified. Since he had never sailed with animals before, Cassidy had no opinion as to whether the crates were adequate, nor did he testify as to the quality and edibility of the food, except to say he only saw hay, and that the food which was stored on deck was covered by a tarpaulin. Finally, questioned as to why he thought the animals had died, he expressed the view they had just given up the will to live.

The government also relies upon the testimony of Dr. Keith Sherman, a veterinarian pathologist with the Department of Agriculture, who performed necropsies at the Clifton Quarantine Station upon the four zebras who were dead upon the vessel's arrival at the Port of New York, and on other animals who died at the Quarantine Station soon after processing there. The processing included tattooing an ear, drawing blood from the animal and forcing it into a vat for a chemical bath. The animals necropsied included zebras, a gerenuk (a small antelope), two dik diks, a wildebeeste and a Speke gazelle. Dr. Sherman found the zebras suffered superficial wounds and abrasions; that none of the animals had pneumonia or any infectious disease, but he did find all were emaciated, "whether the food was not presented or the animals just plain didn't eat, and I imagine this was the case." In his opinion, the cause of death

was physical exhaustion, probably due to environmental stress in transit. The doctor acknowledged that failure of an animal to eat food might be due to a severe state of depression brought on by its confinement during transportation in an enclosed cage and out of its natural habitat, and that this would produce stress and lead to emaciation and exhaustion.

As to the abrasions, he testified these could have resulted either from the wild animals being bounced about by a physical force other than their own action or because of a bony prominence striking a hard surface while in a reclining position, resulting in a so-called decubital ulcer.

Finally, in further support of its burden of proof, the government relied upon the inference authorized by the statute that "the presence in such vessel * * of a substantial ratio of dead, crippled, diseased, or starving wild animals * * * shall be deemed prima facie evidence of the violation" of the statute [1]—a provision we shall hereafter consider in detail.

Upon the close of the government's case in chief, the defendants moved for a directed verdict of acquittal. This Court, applying the standard of a fair preponderance of the evidence, which long has been the rule in this Circuit [2] on such a motion, but which recently has been drawn into question by a panel of the Court of Appeals,[3] denied the motion, holding there was sufficient evidence for the case to go to the trier of the fact—in this instance, the Court without a jury.

The defendants thereupon went forward and offered evidence to rebut the government's case. The principal witness was Curley Blocker, a seasoned animal keeper of some forty years experience, who was specially engaged to tend and care for thirty-three animals destined for delivery to one of the consignees of the shipment, and who, together with a young assistant, looked after all the animals aboard the New Westminster City. The crates, he testified, were standard, adequately sized and with sufficient ventilation, lashed down to prevent them from shifting on deck. They were cleaned every morning and washed every other day. The animals were daily fed and watered; any moldy food was tossed overboard. The zebras were fed grain, hay, corn and bran; the giraffes were also fed oranges and apples; some of the smaller animals were fed grain, and some were fed milk from baby bottles. Both Blocker and his assistant attempted to save the animals, coaxing them to eat, injecting them with penicillin, and even using a sling to lift them back onto their feet.

Thomas Carr-Hartley, the principal of T. Carr Hartley & Sons, Ltd., a defendant, which shipped some of the animals, testified that the crates were safe and adequate; indeed that they had to be so constructed to conform to local regulations. Mr. Carr-Hartley, a leading trapper and shipper of wild animals, further testified that he supervised the loading of the animals on the ship and that only first quality food was purchased for the animals.

An expert breeder and importer of wild animals also testified for the defense. His testimony was to the effect that the crating and other conditions under which the animals were imported were adequate and safe; that the on deck stowage was proper; that it was not unusual to have shipments arrive in November, and that the absence of pneumonia in any of the animals indicates they had not been exposed to any

1. 18 U.S.C. § 42(c) (2).

2. See United States v. Masiello, 235 F.2d 279, 284–285 (2d Cir.), cert. denied sub nom. Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 7 L.Ed.2d 79 (1956) ;

United States v. Feinberg, 140 F.2d 592, 594 (2d Cir.), cert. denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944).

3. See United States v. Glasser, 443 F.2d 994, 1006 n. 7 (2d Cir. 1971).

severe weather; and finally, incidence of death in shipments of animals is not unusual, even where adequate protection is afforded.

We consider each of the allegations separately. As to the charge that the animals were shipped under unhealthful conditions because the crates were stowed on the top deck of the vessel, and so subjected to heavy rain, cold, and other inclement weather, the evidence indicates that such stowage is not, of itself, harmful to animals when an experienced keeper is in regular attendance and regulates the coverings on the crates to protect the animals from the weather; and further, the evidence establishes that stowage below decks may well have been unhealthful in view of the serious problems of ventilation and the real possibility of suffocation. The evidence warrants a further finding that competent animal keepers, one of extraordinary experience in transporting animals, were in attendance at all times, and they took all necessary precautions to protect their charges from inclement weather.

The government, however, takes the categorical position that for the defendants to have originated the shipment in mid-October, knowing that rough weather conditions would likely be encountered off the Cape of Good Hope and later off Cape Hatteras, with a November landing in New York in cold weather, was by itself sufficient to establish inhumane and unhealthful conditions. But the weather maps in evidence indicated that there was little probability of encountering severe winds and the ship was actually forced to undergo only one day of gale force winds. The cold temperatures were not a problem for the animals so long as an experienced keeper was in regular attendance and adequate precautions were taken, as was the case here. Other shipments had arrived successfully in November; indeed, forty or fifty animals had been shipped on almost the same date the previous year with only one casualty. To adopt the government's theory would allow shipments of wild animals from Africa to New York only at the risk of per se violations of the statute. This would in effect declare the voyage route off bounds during that period.

Nor has the government sustained the allegation in the indictment that the crates were too small, unsafe, improperly constructed and otherwise unsuitable for the transportation of the animals. The evidence established to the contrary that they were safe and adequate and constructed in accordance with local law. Indeed, the testimony of an expert on shipping of animals indicated that to have enlarged the size of the cages or to have padded them would have created hazardous opportunities, as past experience had shown, for the animals to inflict self-injury, such as broken necks, with resulting deaths. The government failed to counter this testimony.

As to the claim that the cages should have been heated, the evidence establishes that keeping the animals warm through controlled tarpaulins presented no problem; further, the government's own witness testified he did not know how the cages themselves could be heated.

Finally, the government offered no evidence to sustain its charge that the feed given the animals during the voyage was partially inedible. All of the testimony indicates that there was an abundance of adequate food and that inedible food was tossed overboard.

With respect to each of the government's allegations, it is significant that although the statute expressly provides that the vessel's condition upon arrival "shall constitute relevant evidence" in determining whether there has been a violation, and further the regulations provide for an investigation "[w]hen any customs officer has good reason to believe that wild animals * * * have been imported under inhumane or un-

healthful conditions," [4] no proof of such investigation was offered, although customs officials boarded the vessel and observed all the conditions under which the animals had been transported.

The government, however, places much reliance upon the inference authorized under the statute, already referred to, based upon a substantial ratio of dead animals in the shipment. Even if the statute were to survive serious constitutional obstacles,[5] a question unnecessary to decide, a factual issue remains as to whether a substantial ratio has been established. A total of twelve animals died by the time the vessel docked and was unloaded. The government contends that those who died at the Quarantine Station after docking should also be included in calculating the ratio. This is questionable since there is substantial testimony which may not be disregarded that some of the deaths at the Quarantine Station may be attributed to the stress of quarantine processing, and thus the animals would not have been starved aboard the vessel. For example, two animals died at Quarantine nine days after arrival. In any event, even if those who died post-docking are included, then a total of approximately thirty per cent died both during the voyage and soon thereafter. If the Court is limited under the statute to those which died during the voyage and up to unloading at the port, then the ratio is only fifteen per cent.

While there is no judicial ruling under the statute as to what constitutes a substantial ratio, most of the ratios of deaths presented to the Senate Subcommittee which recommended passage of this statute portrayed far more tragic incidents than the one here at issue; indeed, some showed a total loss of shipment and an absence of any care by attendants or other protection for the animals.[6] And even assuming that the government has established a "prima facie" case in reliance upon a "substantial ratio" referred to in the statute, this has been rebutted by the defense.

The conditions presented to Congress which led to the enactment of this statute far surpass anything involved in the unfortunate voyage of the New Westminster City.[7] The evidence warrants a finding that, once removed from their native habitat and environment, and in the course of a long sea voyage, the animals were subjected to stress, and consequently some refused to eat, leading to emaciation. Upon the whole record, in view of the adequate crates, the adequate food, the adequate care afforded the animals aboard the New Westminster City, the government has failed to prove beyond a reasonable doubt that the defendants knowingly caused or permitted any wild animals to be transported to the United States under inhumane or unhealthful conditions.

Accordingly, each defendant is found not guilty.

The foregoing shall constitute the Court's Findings of Fact.

---

4. 18 U.S.C. § 42(c) (1) and 19 C.F.R. § 12.26(k).

5. *See* Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

6. *See generally* Hearings on S.1447 Before a Subcomm. of the Senate Comm. on Interstate and Foreign Commerce, 80th Cong., 2d Sess. (1948). Some of the ratios in evidence indicated a 100% loss of elephants, *id.* at 8; a 100% loss of camels, *id.* at 10; a 100% loss of turtles, *id.* at 18; an 88% loss of birds, *id.* at 17; an 85% loss of penguins, *id.* at 7; a 50% loss of elephants, *id.* at 6; over a one-third loss of monkeys, *id.* at 8; a 24% loss of birds, *id.* at 22; and a 19% loss of monkeys, *id.* at 8.

7. *See generally* S.Rep.No.1447, 80th Cong., 2d Sess. (1948).