**Commonwealth v. Sammartino**

*Thomas E. Butler, Jr.,* Assistant District Attorney, for Commonwealth.

*Samuel Smith,* for defendant.

SPAETH, J., February 28, 1973.—

### NATURE AND HISTORY OF THE CASE

Defendant was convicted by a jury of having in his possession more than 5,000 cigarettes in packages stamped with counterfeit Pennsylvania tax stamps, in violation of the Pennsylvania Cigarette Tax Act of July 22, 1970, P. L. 513, (No. 178), art. ix, sec. 903(b), 72 PS §3169.903(b), which provides:

"Any person other than a duly licensed stamping agency or other person specifically exempted by the provisions of this act who shall possess more than five thousand cigarettes, the packages of which do not have affixed thereto the proper amount of genuine Pennsylvania cigarette tax stamps shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to a fine of not less than a thousand dollars ($1000) nor more than five thousand dollars ($5000) and costs of prosecution or in default thereof to suffer imprisonment for not more than ninety days."

Defendant has moved in arrest of judgment or for a new trial, contending that the record is insufficient to show that he possessed the cigarettes, and that even if this is not so, his conviction was a denial of due

process because there was no proof that he had any criminal knowledge or intent.[1]

In presenting these issues, defendant is renewing arguments that he made during the trial, when he excepted to the trial judge's charge to the jury that it could find that defendant possessed the cigarettes, and that if it did so find, it could convict defendant because possession alone, without criminal knowledge or intent, constituted a violation of section 903(b) of the Pennsylvania Cigarette Tax Act.

## DISCUSSION

■ *Was the trial judge correct in charging the jury that it could find that defendant possessed the cigarettes?*

The record may be summarized as follows:

Defendant drove a panel truck, registered in his name, with more than 5,000 cigarettes as cargo. He knew that he was carrying cigarettes as cargo. At the time of his arrest he was in the act of unloading the cigarettes from the truck into a warehouse. The cases in which the cigarettes were packed were open, revealing the ends of the cigarette cartons. The evidence that the stamps on the cigarette packages were counterfeit was unrebutted. It also appeared, however, that to identify the stamps as counterfeit required expert knowledge.

On this record, the jury could find that defendant was in possession of more than 5,000 cigarettes,

---

[1] Defendant was also charged under section 902(a) of the Pennsylvania Cigarette Tax Act (sale of "any pack of cigarettes which does not have affixed . . . the proper amount of . . . tax stamps"), section 904(a) (counterfeiting), and section 904(b) (possession of counterfeited stamps), and of conspiracy to violate the Pennsylvania Cigarette Tax Act. Each of these charges required proof of criminal knowledge or intent. On each, defendant was acquitted by the jury.

although innocently, i.e., without knowing that the stamps were counterfeit. "The word 'possession' has a common meaning which is generally understood; there is no requirement that it be defined in the charge . . . Possession involves the power of control and intent to control . . . The duration of the possession is immaterial . . .": Commonwealth v. Yaple, 217 Pa. Superior Ct. 232, 239, 273 A.2d 346, 350 (1970) (citations omitted.)

■ *Was the trial judge correct in charging the jury that if it found that defendant possessed the cigarettes, it could convict him because possession alone, without proof of criminal knowledge or intent, constituted a violation of the Pennsylvania Cigarette Tax Act?*

(a) *Does section 903(b) of the Pennsylvania Cigarette Tax Act make possession alone a crime, even though there is no proof of criminal knowledge or intent?*

The Pennsylvania Cigarette Tax Act is entitled, "An Act imposing a tax on the sale or possession of cigarettes and providing penalties." As indicated by this title, the act establishes procedures for collecting the tax and penalties for violating the provisions of the act.

Section 205 of the act, 72 PS §3169.205, provides:

"Liability for collection of tax

"Every person shall be liable to pay . . . the tax imposed by this act on all cigarettes received by him to which Pennsylvania cigarette tax stamps have not been previously affixed, the tax paid, or exempted by the provisions of this act."

Section 903 of the act, 72 PS §3169.903, provides:

"Possession of unstamped cigarettes

"(a) Any person other than a duly licensed stamping agency or other person specifically exempted by the provisions of this act who shall possess more than

two hundred but less than five thousand cigarettes, the packages of which do not have affixed thereto the proper amount of genuine cigarette tax stamps shall be guilty of a summary offense and upon conviction thereof shall pay a fine of twenty-five dollars ($25) per two hundred cigarettes or fraction thereof, (all of which shall be considered as one violation) plus costs of prosecution and in default thereof to suffer imprisonment for not more than sixty days.

"(b) Any person other than a duly licensed stamping agency or other person specifically exempted by the provisions of this act who shall possess more than five thousand cigarettes, the packages of which do not have affixed thereto the proper amount of genuine Pennsylvania cigarette tax stamps shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to a fine of not less than a thousand dollars ($1000) nor more than five thousand dollars ($5000) and costs of prosecution or in default thereof to suffer imprisonment for not more than ninety days.

"(c) Any person who shall falsely or fraudulently, maliciously, intentionally or wilfully with intent to evade the payment of the Pennsylvania cigarette tax possess any pack of cigarettes which does not have affixed thereto the proper amount of genuine Pennsylvania cigarette tax stamps shall be guilty of a felony and upon conviction thereof shall be sentenced to pay a fine of not more than five thousand dollars ($5000) and costs of prosecution and to suffer imprisonment for a term of not more than five years."

It will be observed that these provisions provide for dual enforcement: One may be civilly liable for the amount of the tax not paid on the cigarettes he possesses, and criminally liable for possessing them. (So far as the court is aware, with respect to defend-

ant, the Commonwealth has availed itself only of the criminal provisions of the act.)

It will further be observed that the criminal provisions specify a range of penalties dependent on the degree of wrongdoing. Thus, three levels of illegality are identified, in ascending order: Section 903(a), possession of a relatively small number of cigarettes; section 903(b), possession of a large number of cigarettes; and section 903(c), possession of "any pack" of cigarettes "falsely or fraudulently, maliciously, intentionally or wilfully with intent to evade the payment of the Pennsylvania cigarette tax." These different sorts of possession constitute, respectively: (a) a "summary offense"; (b) a "misdemeanor"; and (c) a "felony." Similarly, the amount a defendant may be liable to pay as a fine ascends with the amount of cigarettes he is found to possess under sections 903(a) and 903(b); and he may be sentenced to prison only if convicted of possession with the requisite intent under section 903(c).

These provisions demonstrate that the legislature intended to distinguish between innocent possession and possession with criminal knowledge or intent.[2] Indeed, the provisions admit of no other interpretation.

(b) *Does section 903(b) of the Pennsylvania Cigarette Tax Act represent a denial of defendant's right to due process?*

(i) *Herewith a statement of the law as applied by the trial judge.*

Whether postulated as a problem "of 'mens rea,' of 'willfulness,' of 'criminal responsibility' or 'scienter,' the infliction of criminal punishment upon the

---

[2] Note that section 903 would not apply to someone who did not know that he possessed cigarettes. See Commonwealth v. Simpson, 222 Pa. Superior Ct. 296, 302 n. 2, 294 A.2d 805, 807-8 (1972), and the cases cited therein.

unaware has long troubled the fair administration of justice": United States v. International Mining & Chemical Corp., 402 U. S. 558, 565, 91 S. Ct. 1697, 29 L. Ed. 2d 178, 183 (1971), Stewart, J., dissenting opinion.

A concise statement of this indeed troublesome problem may be found in Mr. Justice Jackson's opinion for the court in Morissette v. United States, 342 U. S. 246, 72 S. Ct. 240, 96 L. Ed. 288 (1952). He traces the development of the law from the eighteenth century idea that "vicious will" is a requirement of any crime to the current idea that the legislature in an effort to control "particular industries, trades, properties or activities that affect public health, safety or welfare, id. at 254, 72 S. Ct. at 245, 96 L. Ed. at 296, may declare conduct criminal even when unaccompanied by criminal knowledge or intent, as is done, for example, in statutes regulating the sale and distribution of narcotics: United States v. Behrman, 258 U. S. 280, 42 S. Ct. 303, 66 L. Ed. 619 (1922); United States v. Balint, 258 U. S. 250, 42 S. Ct. 301, 66 L. Ed. 604 (1922). And see Sayre, Public Welfare Offenses, 33 Colum. L. R. 55 (1933).

As it happened, in Morissette the court found it unnecessary to decide whether such a declaration by the legislature might violate a defendant's right to due process. Because of the common-law nature of the offense there charged, theft of property from government lands, the court concluded, as a matter of statutory construction, that the Congress had not intended that criminal knowledge or intent need not be proved as an element of the crime. However, the court rather plainly indicated that had the Congress so intended, it could have accomplished its intention, for the court stated in a footnote that the "Consequences of a general abolition of intent as an ingredient of serious

crimes have aroused the concern of responsible and disinterested students of penology. Of course, they would not justify judicial disregard of a clear command to that effect from Congress, but they do admonish us to caution in assuming that Congress, without clear expression intended in any instance to do so": Morissette v. United States, supra, n. 14 at 254, 72 S. Ct. at 245, 96 L. Ed. at 296.

The view of the Pennsylvania courts in dealing with "mere possession" statutes, and with other statutes making criminal an act done with no criminal knowledge or intent, has been that "Whether a criminal intent, or a guilty knowledge, is a necessary element of a statutory offence . . . is a matter of construction. It is for the legislature to determine whether the public injury, threatened in any particular matter, is such and so great as to justify an absolute and indiscriminate prohibition": Commonwealth v. Weiss, 139 Pa. 247, 251, 21 Atl. 10, 10 (1891), cited in Commonwealth v. Koczwara, 397 Pa. 575, 582, 155 A.2d 825, 828 (1959). And see Commonwealth v. Bready, 220 Pa. Superior Ct. 157, 286 A. 2d 654 (1971).

Various situations have been presented in which it has been held that it is the doing of the act that the legislature has prohibited, and that the doing may not be excused because of the doer's lack of intent or knowledge or mistake. See, for example, Commonwealth v. Koczwara, 397 Pa. 575, 155 A.2d 825 (1959) (sale of liquor to a minor); Commonwealth v. Weiss, 139 Pa. 247, 21 Atl. 10 (1891) (sale of oleomargarine as butter); Commonwealth v. Yaple, 217 Pa. Superior Ct. 232, 273 A. 2d 346 (1970) (possession of narcotics); Commonwealth v. Knox, 172 Pa. Superior Ct. 510, 94 A. 2d 128 (1953) (violation by a magistrate of an act relating to bail); Commonwealth v. Fine, 166 Pa. Superior Ct. 109, 70 A. 2d 677 (1950) (illegal assistance

to a voter); Commonwealth v. Jackson, 146 Pa. Superior Ct. 328, 22 A. 2d 299 (1940) (sale of milk below the regulated price); Commonwealth v. Hackney, 117 Pa. Superior Ct. 519, 178 Atl. 417 (1935) (failure of a tax collector to pay over moneys collected); Commonwealth v. Liberty Products Co., 84 Pa. Superior Ct. 473 (1925) (manufacture of an alcoholic beverage during prohibition); and Commonwealth v. LaBar, 32 Pa. Superior Ct. 228 (1906) (removal of timber from State lands).

In Commonwealth v. Koczwara, supra, Mr. Justice Cohen explained the basis of such decisions as follows:

"In recent decades . . . many states have enacted detailed regulatory provisions in fields which are essentially non-criminal, e.g., pure food and drug acts, speeding ordinances, building regulations, and child labor, minimum wage and maximum hour legislation. Such statutes are generally enforceable by light penalties, and although violations are labeled crimes, the considerations applicable to them are totally different from those applicable to true crimes, which involve moral delinquency and which are punishable by imprisonment or another serious penalty. Such so-called statutory crimes are in reality an attempt to utilize the machinery of criminal administration as an enforcing arm for social regulations of a purely civil nature, with the punishment totally unrelated to questions of moral wrongdoing or guilt. It is here that the social interest in the general well-being and security of the populace has been held to outweigh the individual interest of the particular defendant. The penalty is imposed despite the defendant's lack of criminal intent or mens rea": Id. at 580, 155 A. 2d at 827-28[3]

---

[3] It should be noted that Leary v. United States, 395 U.S. 6, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969), is a different case and not in point to disposition of the present case. Leary stands for the

10

In the present case, the trial judge in charging the jury followed this statement of the law. Counsel for defendant, recognizing this fact, argued at trial and argues now that the law should be different. This argument is by no means merely a desperate resort.

(ii) *Is Commonwealth v. Koczwara persuasive?*

It may seem simple impropriety for a lower court to ask whether an appellate decision still undisturbed by the appellate court that issued it is "persuasive." However, in Commonwealth v. Koczwara, supra, Mr. Justice Cohen made it plain that the court was troubled by the conclusion it considered itself obliged to reach.

Koczwara may be stated as follows: Defendant was the licensee and operator of a tavern. The Commonwealth's evidence showed that minors had frequented the tavern without parental supervision and that beer had been sold to them. Defendant demurred. When the demurrer was overruled, defendant offered no evidence and moved for a directed verdict. The motion was denied, the case went to the jury, and the jury returned a verdict of guilty. In denying defendant's motion in arrest of judgment, the lower court stated that "[t]here was *no* evidence that the defendant was present on any one of the occasions testified to by these witnesses, nor that he had any personal knowledge of the sales to them." Id. at 579, 155 A. 2d at 827.

---

proposition that "a criminal statutory presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend": Id. at 36, 89 S. Ct. at 1548, 23 L. Ed 2d at 82.

In the cases discussed by Mr. Justice Cohen, as in the present case, there is no statutory presumption that defendant had criminal knowledge or intent; he may be convicted whether he knew or did not know of the illegality of his act; the question of the validity of a statutory presumption, therefore, does not arise.

The lower court, nevertheless, denied defendant's motion and sentenced him to pay a fine of $500 and to undergo imprisonment for three months. The Superior Court affirmed. The Supreme Court granted defendant's petition for allowance of an appeal, and affirmed in part and reversed in part, upholding the fine but setting aside the imprisonment.

At the outset of the opinion for the Supreme Court, Mr. Justice Cohen acknowledged that "At common law, any attempt to invoke the doctrine of respondeat superior in a criminal case would have run afoul of our deeply ingrained notions of criminal jurisprudence that guilt must be personal and individual." Id. at 579-80, 155 A. 2d at 827.

To this statement, the Justice appended the following footnote:

"The distinction between respondeat superior in tort law and its application to the criminal law is obvious. In tort law, the doctrine is employed for the purpose of settling the incidence of loss upon the party who can best bear such loss. But the criminal law is supported by totally different concepts. We impose penal treatment upon those who injure or menace social interests, partly in order to reform, partly to prevent the continuation of the antisocial activity and partly to deter others. If a defendant has personally lived up to the social standards of the criminal law and has not menaced or injured anyone, why impose penal treatment?" Id. at 580, n. 1, 155 A. 2d at 827.

As has been noted, the court answered this question by holding that penal treatment could be imposed in "an attempt to utilize the machinery of criminal administration as an enforcing arm for social regulations of a purely civil nature [as food and drugs, speeding, building regulations, child labor, wages and hours, and intoxicating liquor]." Id.

Nevertheless, it is evident from the court's opinion that it was troubled by this answer;[4] for after holding that the legislature had the power to declare defendant's conduct criminal, the court went on to hold that to impose punishment of imprisonment constituted a denial of due process. Said the court:

"The Courts of the Commonwealth have already strained to permit the legislature to carry over the civil doctrine of *respondeat superior* and to apply it as a means of enforcing the regulatory scheme that covers the liquor trade. We have done so on the theory that the Code established petty misdemeanors involving only light monetary fines. It would be unthinkable to impose vicarious criminal responsibility in cases involving true crimes. Although to hold a principal criminally liable might possibly be an effective means of enforcing law and order, it would do violence to our more sophisticated modern-day concepts of justice. Liability for all true crimes, wherein an offense carries with it a jail sentence, must be based exclusively upon personal causation. It can be readily imagined that even a licensee who is meticulously careful in the choice of his employees cannot supervise every single act of the subordinates. A man's liberty cannot rest on so frail a reed as whether his employee will commit a mistake in judgment. See Sayre, Criminal Responsibility For Acts Of Another, 43 Harv. L. Rev. 689 (1930). (Italics supplied.)

"This Court is ever mindful of its duty to maintain and establish the proper safeguards in a criminal trial. To sanction the imposition of imprisonment here would make a serious change in the substantive criminal law of the Commonwealth, one for which we find no justification. We have found *no* case in any

---

[4] It may also be noted that Mr. Justice Musmanno and Mr. Justice McBride each filed a vigorous dissent.

jurisdiction which has permitted a *prison term* for a vicarious offense. The Supreme Court of the United States has had occasion only recently to impose due process limitations upon the actions of a state legislature in making unknowing conduct criminal. Lambert v. California, 355 U. S. 225, 78 S. Ct. 240 (1957). Our own courts have stepped in time and again to protect a defendant from being held criminally responsible for acts about which he had no knowledge and over which he had little control. Commonwealth v. Unkrich, 142 Pa. Superior Ct. 591, 16 A. 2d 737 (1940); Commonwealth v. Schambers, 105 Pa. Superior Ct. 467, 161 Atl. 624 (1932); Commonwealth v. Rovnianek, 12 Pa. Superior Ct. 86 (1899). We would be utterly remiss were we not to so act under these facts. (Italics supplied.)

"In holding that the punishment of imprisonment deprives the defendant of due process of law under these facts, we are not declaring that Koczwara must be treated as a first offender under the Code. He has clearly violated the law for a second time and must be punished accordingly. Therefore, we are only holding that so much of the judgment as calls for imprisonment is invalid, and we are leaving intact the five hundred dollar fine imposed by Judge Hoban under the subsequent offense section." Id. at 585-86, 155 A. 2d at 830-31.[5]

---

[5] Lest this passage be misunderstood, it may be well to comment on the three Pennsylvania cases cited. In Unkrich defendant did not know that he had purchased stolen automobiles, the defaced serial numbers being in a "secret" place known only to the manufacturer and the police. In Schambers, defendant did not know that a bottle of whiskey was in his car. In Rovnianek, defendant did not know that contrary to his instructions his newspaper had published a libel. As these cases did not resolve the problem before the court in Koczwara, so they do not here; they would be pertinent only if defendant had not known that the

It is evident that this reasoning presents certain difficulties. There is no definition of what a "true crime" is, as distinguished from another sort of crime. Moreover, the right to due process includes not only the right not to be unfairly deprived of liberty but also the right not to be unfairly deprived of property. It is, therefore, not apparent why, if "the punishment of imprisonment deprives the defendant of due process of law," the punishment of requiring him to pay a fine does not do the same. As a practical matter, a defendant may suffer more from being required to pay a large fine than from being imprisoned for a brief period. An additional difficulty is that the greatest deprivation, both of a defendant's liberty and his property, may well be worked not by imprisonment or fine but by the mere fact of his having been declared a "criminal"; for there will be many jobs that a person with a criminal record will be unable to get, and those jobs that can be had will probably pay low salaries. Finally, the question presents itself whether the attempt to regulate noncriminal conduct by making it criminal is not as a matter of policy fundamentally unwise. If the legislature wishes to preserve its revenues, it need not resort to criminal sanctions; indeed, as has been noted, the Pennsylvania Cigarette Tax Act, supra, provides that the Commonwealth may proceed civilly for recovery of unpaid taxes. Nor can it be maintained that to impose criminal sanctions will have a deterrent effect, for defendant by definition had no criminal knowledge or intent; one cannot be deterred from doing wrong if he does not know that what he is doing is wrong. Increasingly, students of

---

cargo in his truck was cigarettes, as, for example, if he had thought he was delivering a load of cartons of candy to be sold in the vending machines for which the cigarettes were destined.

the criminal law have urged that a principal reason the criminal courts are so overwhelmed with litigation is that many transactions not criminal have, nevertheless, in a futile effort of regulation been declared criminal. See, e.g., N. Morris & G. Hawkins, The Honest Politician's Guide to Crime Control (1970). And see J. Rawls, A Theory of Justice (1971), especially section 38, arguing that except "in some extreme eventualities," id. at 242, respect for the law depends upon criminal sanctions being imposed only for deliberately wrongful conduct. Query whether the statutory provisions involved in Koczwara and in the present case are not illustrations of such "overcriminalization" of the law.

Whatever may be the answer to such questions, it is evident that the court in Koczwara held as it did because it considered itself bound by precedent. Thus, it cited authority "as long ago" as 1891 that the legislature has the power to eliminate criminal knowledge or intent as an element of a statutory offense: Koczwara, supra, at 582, 155 A. 2d at 828, citing Commonwealth v. Weiss, 139 Pa. 247, 21 Atl. 10 (1891); and it placed considerable emphasis upon an earlier holding that " 'There is perhaps no other area of permissible state action within which the exercise of the police power of a state is more plenary than in the regulation and control of the use and sale of alcoholic beverages' ": Id. at 580-81, 155 A. 2d at 828, citing and quoting Tahiti Bar, Inc. Liquor License Case, 395 Pa. 355, 360, 150 A. 2d 112, 115 (1959). So far as concerns the wisdom of the attempt to regulate noncriminal conduct by declaring it criminal, although the court was shocked by, and struck down, the imposition of a sentence of imprisonment, it appears to have regarded the imposition of a fine as rather in the nature of a cost of doing business, stating that the " [d]efendant,

by accepting a liquor license, must bear this financial risk." Id. at 585, 155 A. 2d at 830.[6]

Even so, the court was not reassured by its resort to precedent. Having "fully recognize[d]" the legislature's power to eliminate the element of criminal knowledge or intent, the court went on in a footnote to remark:

"For an extremely interesting and incisive analysis of the mens rea requirement in criminal offenses, see Mueller, On Common Law Mens Rea, 42 Minn. L. Rev. 1043 (1958). While we sympathize fully with the author's eloquent plea for a return to the moral implications of criminal guilt, we await further determinations by the Supreme Court of the United States as to whether the rationale of Lambert v. California, 355 U. S. 225, 78 S. Ct. 240 (1957), will be extended to all statutory offenses which have been interpreted as not requiring a criminal mens rea. See also Allen, Book Review, 66 Yale L. J. 1120 (1957); Mueller, Mens Rea And The Law Without It, 58 W. Va. L. Rev. 34 (1955)." Id. at 584, n. 6, 155 A. 2d at 829, n. 6.

(iii) *Has Commonwealth v. Koczwara been undermined by later decisions of the United States Supreme Court?*

In Lambert v. California, supra, the facts were as follows:

Defendant had been found guilty of violating the Los Angeles Municipal Code, which made it a criminal offense for a convicted felon to be in Los Angeles

---

[6] It may be noted that the Pennsylvania Cigarette Tax Act appears to have been enacted as responsive to, and in conformity with, Koczwara, for, as has been discussed, there is no provision for imprisonment unless there is criminal knowledge or intent; absent criminal knowledge or intent, the greatest sanction available is a fine. Thus, the legislature avoided the mistake it had made in the Liquor Code.

without registering with the police, and had been fined $250 and put on probation for three years. The California courts held that the Municipal Code provided for conviction regardless of defendant's knowledge of the registration requirement, and that in doing so it did not violate the Constitution. Accordingly, on defendant's appeal, the United States Supreme Court was faced with the question whether such an enactment was constitutional; the court was not free to rely upon statutory construction, as it had in Morissette v. United States, supra.

In holding that the Municipal Code did violate the Constitution, the court made it clear that despite footnote 14 in Morissette, supra at 254-55, 72 S. Ct. at 245-46, 96 L. Ed. at 296, there is some limitation on the legislature's power to eliminate intent as an element of a crime. Thus, Mr. Justice Douglas, in his opinion for the court, said that the question presented was "whether a registration act . . . violates due process where it is applied to a person who has no actual knowledge of his duty to register, and where no showing is made of the probability of such knowledge": Lambert v. California, supra at 227, 78 S. Ct. at 242, 2 L. Ed. 2d at 231.

The Justice went on to answer this question as follows:

"[T]he principle [that notice is required in a situation where a penalty might be suffered for mere failure to act] is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case.

". . .

"Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with

due process": Id. at 228-30, 78 S. Ct. at 243, 2 L. Ed. 2d at 231-32.

In dissent, Mr. Justice Frankfurter, joined by Mr. Justice Harlan and Mr. Justice Whittaker, said:

"The present laws of the United States and of the forty-eight States are thick with provisions that command that some things not be done and others be done, although persons convicted under such provisions may have had no awareness of what the law required or that what they did was wrongdoing.

". . .

"[W]hat the Court here does is to draw a constitutional line between a State's requirement of doing and not doing. What is this but a return to Year Book distinctions between feasance and nonfeasance—a distinction that may have significance in the evolution of common-law notions of liability, but is inadmissible as a line between constitutionality and unconstitutionality.

". . .

"If the generalization that underlies, and alone can justify, this decision were to be given its relevant scope, a whole volume of the United States Reports would be required to document in detail the legislation in this country that would fall or be impaired . . . I feel confident that the present decision will turn out to be an isolated deviation from the strong current of precedents—a derelict on the waters of the law": Id. at 230-32, 78 S. Ct. at 244-45, 2 L. Ed. 2d at 233.

Without entering into an appraisal of this difference between the majority and dissenting Justices, it is evident that the court in Koczwara was correct in finding Lambert of no assistance, for in Koczwara, as in the present case, there had been affirmative acts. In considering the question posed in Koczwara, whether Lambert "will be extended to all statutory

offenses which have been interpreted as not requiring a criminal mens rea," at first it appears that Mr. Justice Frankfurter's prediction that Lambert would "turn out to be an isolated deviation from the . . . precedents" has come true, for the cases citing Lambert have construed it as narrowly limited to a situation involving a defendant's failure to act as compared to his affirmative action. See United States v. Weiler, 458 F. 2d 474, 477 (3d Cir., 1972) and United States v. Crow, 439 F. 2d 1193, 1195 (9th Cir., 1971) (possession of firearms); United States v. Betancourt, 427 F. 2d 851 (5th Cir., 1970) (importation of marijuana); United States v. Logan, 434 F.2d 131 (9th Cir., 1970) and United States v. Mancuso, 420 F. 2d 556 (2d Cir., 1970) (failure to register as a narcotics offender when leaving and entering the United States; although differing with each other, both cases read Lambert narrowly). There is, however, a recent decision that requires the closest attention.

In United States v. International Mining & Chemical Corp., 402 U. S. 558, 91 S. Ct. 1697, 29 L. Ed. 2d 178 (1971), the facts were as follows:

The information charged that defendant had shipped sulfuric acid and " 'did knowingly fail to show on the shipping papers the required classification of said property, to wit, Corrosive Liquid, in violation [of a Department of Transportation regulation].' " The Federal statute in question empowered the Department of Transportation to promulgate regulations and provided criminal sanctions for one who "knowingly violates any such regulation." Defendant acknowledged that he had knowingly shipped sulfuric acid, but denied that he had known of the regulation requiring disclosure of that fact on the shipping papers. The District Court dismissed the information. On certified appeal, the United States Supreme Court

reversed (Douglas, J., Stewart, J., joined by Harlan and Brennan, JJ., dissenting.)

At the beginning of the opinion for the court, Mr. Justice Douglas stated that the statute did not eliminate criminal knowledge or intent as an element of the offense, later illustrating this statement as follows:

"So far as possession, say, of sulfuric acid is concerned the requirement of 'mens rea' has been made a requirement of the Act as evidenced by the use of the word 'knowingly.' A person thinking in good faith that he was shipping distilled water when in fact he was shipping some dangerous acid would not be covered [citing Morissette v. United States, supra]": United States v. International Mining & Chemical Corp., supra at 563-64, 91 S. Ct. at 1701, 29 L. Ed. 2d at 183.

However, the Justice went on to hold that the requirement of knowledge evidenced by the use of the word "knowingly" pertained only to knowledge of the fact that acid was being shipped; it did not pertain to knowledge of the fact that there existed a Department of Transportation regulation with respect to such a shipment; and ignorance of that regulation was no defense.

The dissenting Justices were of the view that this was an incorrect construction of the statute. They believed that the Congress intended that a shipper should not be punished criminally unless he knew not only what he was shipping but also that in making the shipment he was violating a Department of Transportation regulation.

It is instructive to compare the facts in International with the facts in the present case. As the defendant in International knew that he was shipping sulfuric acid, so defendant here knew that he was shipping

cigarettes. As the prosecution was not required in International to prove that defendant knew that his shipping papers were contrary to a Department of Transportation regulation, so the prosecution was not required here to prove that defendant knew that the tax stamps on the cigarette cartons were counterfeit. As the statute in International was held to impose criminal sanctions even in the absence of defendant's knowledge of the Department of Transportation regulation, so the statute here was held to impose criminal sanctions even in the absence of defendant's knowledge that the tax stamps were counterfeit.

From this comparison it might appear that since the court in International rejected defendant's argument that to convict him would be a denial of due process, so this court should reject the same argument by defendant here. At this point, however, it is necessary to consider an aspect of International that has not so far been mentioned.

In citing Morissette v. United States, supra, in support of the proposition that defendant would not be guilty had he in good faith believed that he was shipping distilled water, the court quoted the following passage from Morissette:

" 'The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil' ": Id. at 564, 91 S. Ct. at 1701, 29 L. Ed. at 183.

The court went on, however, to say that nevertheless, "[t]here is leeway for the exercise of congressional discretion in applying the reach of 'mens rea,' " id., citing United States v. Balint, 258 U. S. 250, 42 S.

Ct. 301, 66 L. Ed. 604 (1922), supra, and United States v. Murdock, 290 U. S. 389, 54 S. Ct. 223, 78 L. Ed. 381 (1933), which it explained as follows:

"In Balint the Court was dealing with drugs, in Freed [United States v. Freed, 401 U. S. 601, 91 S. Ct. 1112, 28 L. Ed. 2d 356 (1971)] with hand grenades, in this case with sulfuric and other dangerous acids. Pencils, dental floss, paper clips may also be regulated. But they may be the types of products which might raise substantial due process questions if Congress did not require, as in Murdock, 'mens rea' as to each ingredient of the offense. But where, as here and as in Balint and Freed, dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation": United States v. International Mining & Chemical Corp., supra, at 564-65, 91 S. Ct. at 1701-02, 29 L. Ed. 2d at 183.

When applied to the present case, this passage requires this court to ask whether cigarettes are more like drugs, hand grenades, and dangerous acids, or pencils, dental floss and paper clips; for if cigarettes are to be assimilated to pencils, the passage suggests that the legislative power of regulation is not so broad as, for example, in the case of drugs. Granted that the passage is not entirely clear. Even so, it seems fair to conclude from it: that the distinction it draws is between the regulation, on the one hand, of what might generally be described as "dangerous items," and on the other hand, of "non-dangerous items"; that so far as concerns the regulation of dangerous items, the elimination by the legislature of criminal knowledge or intent as an element of the offense is permissible; that this is permissible because in practical

effect there is either no elimination or at least almost no elimination of criminal knowledge or intent, the legislature being entitled to say in advance that it simply will not believe anyone who has dangerous items (drugs, hand grenades, dangerous acids) and yet pleads ignorance of the laws regulating the items; but that with respect to the regulation of nondanger- ous items, an attempt by the legislature to eliminate criminal knowledge or intent "might raise substantial due process questions"; as to which questions, how- ever, the court intimates no answer, except as intima- tion may be found in the court's reference to Morissette v. United States, supra, as involving "no provincial or transient notion."

It will be seen at once that Commonwealth v. Koczwara, supra, is consistent with this interpretation of International, for it involved the regulation of the sale of liquor, which is a business involving something "dangerous." Indeed, it might be argued that Koczwara anticipates International, for in stating that "[d]efend- ant, by accepting a liquor license, must bear this financial risk [of being fined]", Commonwealth v. Koczwara, supra at 585, 155 A. 2d at 828, the court at least came close to stating that defendant would not be heard to say that he did not know that he might be fined if one of his employes, even without his knowledge, sold liquor to a minor.

Most of the other Pennsylvania cases that have been cited above may also be read as consistent with Inter- national, although sometimes a little stretching is required. Commonwealth v. Yaple, supra, involved the sale of narcotics and so is expressly within the holding of International. In Commonwealth v. Weiss, supra, the court said that "persons engaged in the traffic [of oleomargarine] shall engage in it at their peril. . . .": Id. at 252, 21 Atl. at 11. It cannot be said, without

hypocrisy, that oleomargarine is a "dangerous" item. It is reasonable, however, to read the court's statement as equivalent to holding, as was said in International, that a businessman will not be heard to deny knowledge of the laws regulating his business. In Commonwealth v. Liberty Products, supra, the two factors that International suggests are relevant, a dangerous item and the regulation of a business, were both present. The case involved the unlawful manufacture of intoxicating liquor. The court said that "[p]ersons who embark on [the defendant's] business . . . know that their actions are rigidly circumscribed." Id. at 478. In Commonwealth v. Jackson, supra, a majority of the judges appear to have rejected the "dangerous-non-dangerous" distinction later suggested by International. Defendant was a milk dealer. For the majority, this was enough to make him criminally liable for the action of one of his employes in selling milk below the price established pursuant to the Milk Control Act. Judge Rhodes, joined by Judge Cunningham and Judge Stadtfeld, however, dissented, stating, id. at 338, 22 A. 2d at 304, that "[t]he milk business is . . . not in the same category as the liquor business or the selling of adulterated foods," and concluding that, therefore, the Milk Control Act should be construed as requiring defendant to know of his employe's act if he were to be held criminally liable for it. Thus, the decision, like the decision in Weiss, appears to depend not upon the presence of a dangerous item but rather upon a judgment of what it is reasonable to require a business man to know.

Similarly, in Commonwealth v. Knox, supra, defendant was a magistrate, and although again, as in Weiss and in Jackson, the court does indeed speak of criminal liability without criminal knowledge or in-

tent, the case may readily be read as holding, consistent with the approach in International, that anyone who is a magistrate will not be heard to say that he does not know the procedures required by the Magistrates' Court Act incident to the acceptance of real estate bail. In Commonwealth v. Fine, supra, this rationale was made explicit. There, defendant was found guilty of illegal assistance to voters, the lower court (Bok, J.) remarking that "anyone should know he has no right inside the voting booth with another voter without express legal authority": Id. at 114, 70 A. 2d at 680. In Commonwealth v. Hackney, supra, defendant was a tax collector who failed to turn over to the county treasurer some $33,000 collected taxes. It would seem that he would not be heard to say that he did not know he should have turned over the taxes, and perhaps the case stands for that proposition, the court saying that "[d]irect proof of a guilty intent is not always necessary": Id. at 524, 178 Atl. at 419. It should be added, however, that the court's observation about it being unnecessary to prove that defendant had a guilty intent may be regarded as dictum inasmuch as defendant had been indicted for embezzlement.

Having thus reconciled many of the cases with International, it is important to qualify the reconciliation. The reconciliation, it will have been observed, was achieved not by comparing reasoning but results. It may well be that the court in International would reach the same results in the Pennsylvania cases as did the Pennsylvania courts. However, this would be done by reasoning explicitly recognizing that the legislature's power to eliminate criminal knowledge or intent as an element of a statutory offense is limited to certain types of activity; and there is very little, if any,

such recognition in the Pennsylvania cases. Furthermore, at least one of the Pennsylvania cases resists being fitted within International.

In Commonwealth v. LaBar, supra, defendant was convicted of removing timber from land owned by the Commonwealth, although the prosecution neither averred nor proved that he knew that the timber was on land owned by the Commonwealth. It was enough, said the court, if he "went upon the lands of the commonwealth, without authority, and cut and destroyed growing timber": Id. at 233. It cannot be maintained that timber is a dangerous item comparable to narcotic drugs or liquor; nor does it appear that defendant was in the lumbering business and so in a position from which he would not be heard to say that he did not know whose timber he was cutting. If the reasoning of International is applied to such facts, it would seem that the result would be at least to recognize that substantial questions of due process were presented; a brief dismissal of defendant's intent as "immaterial," Commonwealth v. LaBar, id., would not suffice.

In this state of the law, this court finds itself confronted with a difficult problem. It might be held, and the court is tempted to hold, that United States v. International Mining & Chemical Corp., supra, represents the very extension of substantive due process that the court in Commonwealth v. Koçzwara, supra, anticipated might occur; that, consequently, the law now is that the legislature may not eliminate criminal knowledge or intent as an element of a statutory offense when the item sought to be regulated is not dangerous, or unless the circumstances are such as to warrant the conclusion that defendant cannot reasonably deny knowledge or intent; and that, as applied to defendant in the present case, the Pennsylvania Cigarette Tax Act, supra, is a denial of due process,

since the act is not an attempt to regulate a dangerous item but to ensure the collection of revenue, and since it cannot be said that defendant, as a truck driver delivering cigarettes, must as a reasonable man have known of his exposure to criminal liability if the apparently genuine tax stamps on the cigarette cartons should prove to be counterfeit. On balance, however, the court has concluded that it should not go so far. The Pennsylvania cases, in particular Commonwealth v. LaBar, supra, are against such a holding; and while International does appear to extend substantive due process, it must be recognized that, if so, the extension was by dictum, for the holding was that defendant's asserted ignorance of the Department of Transportation regulation was no defense, the court's observation that "substantial due process questions" "might [be] raise [d]" being directed to supposed facts not before the court.

In some circumstances, a lower court might be warranted in ignoring a line of appellate decisions by resorting to dictum in another appellate decision, but not here; for if the reasoning in Koczwara, with its distinction between "crimes" and "true crimes," is unsatisfactory, so is the reasoning in International. Consider, for example, the present case. It cannot be maintained that cigarettes are "dangerous" items. Stated more precisely: Granted that cigarettes are dangerous to one's health, it is apparent that the legislature by the Pennsylvania Cigarette Tax Act did not seek to regulate cigarettes for that reason but rather only as a source of revenue. Does it follow from this conclusion that the court in International would not permit the imposition of criminal sanctions incident to the regulation of cigarettes absent proof of criminal knowledge or intent? The court's reference to "pencils, dental floss, paper clips," suggests such a result. Or would the

court, emphasizing instead that the sale of cigarettes is a business, hold that someone in that business would not be heard to deny knowledge of the various restrictions imposed by the Pennsylvania Cigarette Tax Act? If this approach were taken, it would seem that the businessman to whom defendant was delivering the cigarettes would be subject to fine, even if he did not know that the tax stamps were counterfeit. But would defendant as the truck driver also be subject to fine? There is nothing in International to support a distinction between the criminal liability of a businessman on the one hand, and of his employe on the other, except for the fact that the court was plainly concerned about imposing criminal liability on anyone who is innocent of criminal knowledge or intent, and it might seem that this concern would more readily embrace the employe than the employer.

The more one ponders such questions, the more evident it becomes that the concepts underlying criminal liability have not yet been so clarified as to permit a decision that the legislature has no power to eliminate criminal knowledge or intent as an element of a statutory offense, as least in a case such as the present case. In this court's view, to eliminate criminal knowledge or intent in any case except one of the most unusual urgency is mistaken,[7] because regulation will not be made more effective, and the moral authority of the law will be undermined. It is evident, however, that the legislature is of a different view, and, for the time being, that is the end of the matter.

## ORDER

And now, February 28, 1973, defendant's motion in arrest of judgment or for a new trial is denied.

---

[7] Cf. the illustration by Rawls, supra.